IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| L.C., by and through her<br>Parents, B.C. and A.Z.,<br>of Laurel, Delaware | : | Civil Action |
| Plaintiffs | : | |
| v. | : | No. |
| LAUREL SCHOOL<br>DISTRICT,<br>1160 S. Central Avenue,<br>Laurel, Delaware 19956 | : | |
| Defendant | : | |

**COMPLAINT**

I. **Preliminary Statement**

1. This action is brought by L.C., a young woman with multiple disabilities and her parents, B.C. and A.Z. (the "Parents") (collectively, "Plaintiffs" or the "Family"). Plaintiffs bring this action against Defendant Laurel School District (the "District" or "Defendant"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. and its federal and state implementing regulations; and 14 Del. Admin. C. § 922 et seq.

2. This matter concerns the Family's request that the District provide at public expense an Independent Educational Evaluation ("IEE"). The request was based on the Family's disagreement with the November 2015 Evaluation Summary Report performed by the District. The Family contended that the District's evaluation was not sufficiently comprehensive and was inappropriate and that the Family was therefore entitled to the requested IEE at public expense pursuant to 14 Del. Admin. C. § 926.2.0; 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502(b)(1); and Schaffer v. Weast, 546 U.S. 49 (2005).

3. After a delay, the District denied the requested IEE and filed a Special Education Due Process complaint against the Family to defend its evaluation pursuant to Del. Admin. C. §

926.2.4.1.1. An evidentiary hearing was held before a Delaware Due Process Hearing Panel (the "Panel").

4. On April 21, 2017, the Panel issued its Order ("Order"). While the Panel's Order correctly ordered that the District must fund an independent psychiatric assessment and an independent functional behavioral assessment, other aspects of the Order are incorrect, and should be reversed.

5. For instance, the Panel ruled that, rather than provide independent Occupational Therapy, Speech/Language, and neuropsychological assessments at public expense, the District could simply "repeat" these assessments, even though the District had never performed such assessments. However, such a "do-over" remedy is not authorized by IDEA, which provides that a school district that performs an inappropriate evaluation must fund an *independent* evaluation, rather than be permitted to re-do the evaluation that it failed to perform properly in the first instance.

6. The Order also errs by providing that the Parents must choose a psychiatric evaluator and a behavioral specialist to perform their assessments from "lists" provided by the District. Nothing in IDEA provides that a district that has performed an inappropriate evaluation – and therefore must fund an independent evaluation – is permitted to limit the parents' choice of an evaluator to a self-selected "list" of evaluators.

7. The Family therefore brings this present action seeking reversal of the incorrect aspects of the Panel's Order, and an order that the District must fund an IEE, with the evaluators to be chosen by the Parents.

## II. <u>Parties</u>

8. L.C. was born in 2005 and is currently 11 years old. She was at all relevant times

enrolled in the District. B.C. and A.Z. are L.C.'s parents, and at all relevant times resided with her in Laurel, Delaware.

9. Defendant Laurel School District is located at 1160 S. Central Avenue, Laurel, Delaware, 19956. The District is the recipient of several sources of federal funds and is a public school district designated by Delaware law and the Delaware Department of Education for the provision of educational services to individuals attending the District; such services include those mandated under IDEA as well as Delaware's regulatory scheme concerning young children with disabilities. 14 Del. Admin. C. § 922 et seq.

## III. Jurisdiction and Venue

10. This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under IDEA.

11. Plaintiffs have exhausted their administrative remedies as required under 20 U.S.C. § 1415(i), having participated in a Special Education Due Process Hearing.

12. The family's claims and remedies are authorized by 20 U.S.C. § 1415, and under 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

13. All of the Defendant's actions complained of herein occurred within the jurisdiction of the United States District Court for the District of Delaware. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## IV. Additional Facts Supporting Liability

14. L.C. was born in Ohio in 2005. Unfortunately, L.C. spent almost all of the first five years of her life in an abusive and neglectful home. Child Protective Services removed L.C. and her two other sisters from her biological home when L.C. was almost five years old, and she

lived with two different foster families in Ohio. At the time she was removed from her biological mother's home, L.C. could only speak four words: mommy, daddy, cat, and eat.

15. L.C. faced a number of medical, educational, and emotional issues. She had microcephaly, dental problems, ear infections, motor jerking movements, sleep difficulties, and Speech/Language delays. One of L.C.'s most severe medical conditions, which her doctors did not fully understand until a later time, is referred to as idiopathic intracranial hypertension. This condition results in fluid in the brain putting pressure on L.C.'s optic nerve and impacts how she performs on ocular tasks. Furthermore, L.C. has significant fine motor and sensory needs.

16. L.C. was removed from her first foster home in Ohio because her older biological sister had engaged in sexually inappropriate behavior with another child in the home. It was later discovered that L.C.'s older sister had also sexually abused her. Related to L.C.'s history as a victim of trauma, she has complex emotional and behavioral, as well as psychiatric, needs. She has reportedly sexually abused her younger sister, and engages in self-injurious behaviors in order to draw blood. She has indicated a desire to hurt others, including making homicidal statements.

17. On September 23, 2012, L.C. moved to Delaware to live with her adoptive parents, B.C. and A.Z. She enrolled in school at the District, where she began attending first grade in September 2012.

18. In the fall of 2015, when L.C. was in fourth grade, she enrolled in the Delaware Guidance Services ("DGS") Day Treatment program in Lewes, Delaware at the advice of her treating mental health providers.

19. On November 4, 2015, an Individualized Education Program ("IEP") team met to discuss results of a triennial re-evaluation that was conducted of L.C. on September 23 and 24, 2015. This team included both DGS staff and District representatives.

20. The Evaluation Summary Report ("ESR") that resulted from this meeting contained the results of a cognitive assessment, an academic achievement test, a measure of adaptive skills, and behavior rating scales. The ESR mentions that Speech/Language ("S/L") and Occupational Therapy ("OT") testing was done the prior year, and includes a one-sentence list of some of L.C.'s medical diagnoses.

21. The ESR failed to include a nonverbal test of intelligence, and failed to report L.C.'s nonverbal intelligence scale on the cognitive assessment that was administered. It did not provide any Response to Intervention ("RTI") data, as the District had never provided L.C. with any RTI programming.[1] Furthermore, the behavior rating scales were not completed in line with the protocols for their use.

22. The November 4, 2015 ESR further failed to address the implications of L.C.'s extensive medical history, beyond a mere listing of her diagnoses. It did not contain any S/L or OT testing by professionals working with L.C. in the educational or therapeutic environments. It did not assess L.C.'s areas of need with respect to executive functioning, memory, social skills, attention, Attention Deficit/Hyperactivity Disorder ("ADHD") behaviors, or L.C.'s history of trauma. It also, despite L.C.'s mental health issues, failed to include any psychiatric testing.

---

[1]Under Delaware regulations regarding RTI procedures, "[e]ach public agency shall establish and implement procedures to determine whether a child responds to scientific, research-based interventions (RTI) for reading and mathematics." 14 Del. Admin. C. § 925.12.1. Furthermore, "[a]gencies may also establish and implement procedures to determine whether a child responds to scientific, research-based interventions in oral expression, listening comprehension, and written expression." 14 Del. Admin. C. § 925.12.1.1.

23. Following the completion of the November 4, 2015 ESR, L.C. attended the Day Treatment program at DGS until January 2016, when she was admitted to the Rockford Center inpatient program due to homicidal ideations and other threats of harm. After 32 days, she moved to the Terry Children's Psychiatric Center ("Terry"), where she remained until April of 2016. From Terry, L.C. returned to the District for the end of fourth grade at North Laurel Elementary School.

24. For the 2016-17 school year, L.C. transitioned to Laurel Middle School. Following L.C.'s return, the District failed to comprehensively re-evaluate L.C.'s disability-related educational needs and continued to rely on the inadequate November 4, 2015 ESR that it developed with DGS. As her Parents worked to transition her back to a normal school environment from more therapeutic placements, they had questions and concerns about the evaluative data available to L.C.'s team in programming for her. Those concerns about the deficiencies in the November 4, 2015 ESR led the Parents, via counsel, to request an IEE at public expense on November 22, 2016.

25. The District refused the Parents' request for an IEE at public expense and, on January 4, 2016, over six weeks after receiving the Parents' IEE request, the District filed its Due Process complaint to defend the appropriateness of the November 4, 2015 ESR.

26. The hearing took place over two days, on March 2 and 3, 2017, before the Panel.

27. On April 21, 2017, the Panel issued its Order. The Order by implication denied the requested S/L, OT, and neuropsychological assessments, and ordered that the District, through its employees, "repeat" the "educational evaluations of neuropsychological testing, speech/language testing, and occupational therapy." Notably, the District had not performed its own educational S/L or OT testing, but instead inappropriately relied on previous medical

assessments in those areas, and did not perform a neuropsychological evaluation, so there were no such assessments for the District to "repeat." The Order also provided that the District provide to Parents' counsel a list of Delaware licensed independent psychiatrists, from which the parent's counsel may select a psychiatrist at the expense of the Laurel School District; and further ordered that the District provide a list of "Board Certified Behavioral Analysts" from which the Family's counsel may select to perform a functional behavioral assessment at the District's expense.

**V. Statutory Authority**

28. The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). IDEA and the regulations thereunder, 34 C.F.R. § 300.100 et seq., and 14 Del. Admin. C. § 922 et seq., require that public school districts provide disabled children with a FAPE and provide extensive due process procedures to effectuate that right.

29. Pursuant to these statutes and regulations, school districts have a continuing obligation to properly evaluate and accurately identify all students who are reasonably suspected of possessing a disability under IDEA. Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238 (3d Cir. 1999); W.B. v. Matula, 67 F.3d 484 (3d Cir. 1995), abrogated in part on different grounds, A.W. v. Jersey City Pub. Schools, 486 F.3d 791 (3d Cir. 2007); T.B. v. School Dist. of Phila., 1997 WL 786448 (E.D. Pa. 1997). Such an obligation is known as "Child Find." 34 C.F.R. § 300.111.

30. Under IDEA and Delaware law, a school district must complete an evaluation of children suspected of needing special education services within 45 school days or 90 calendar days, whichever is shorter, of receiving parental consent for the evaluation, and must have an IEP in place at the beginning of each school year for every exceptional child in its jurisdiction. 20 U.S.C. § 1414 (a)(1); 34 C.F.R. § 300.301(c), 300.323 (a); Del. Admin. C. § 925.2.3. The school district's evaluation must encompass all suspected areas of the child's disability, including, if appropriate, health, Speech/Language, Occupational Therapy, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. 20 U.S.C. § 1414(b)(3)(B); 34 C.F.R. § 300.304(c)(4).

31. School districts must evaluate students with disabilities in need of special education once every three years, or more often if the child's needs warrant it. 20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. § 300.303; 14 Del. Admin. C. § 925.3.0. Revaluations must include a variety of assessment tools in all areas of suspected need, including functional and developmental skills, and not limited to those needs commonly associated with a particular eligibility category. 20 U.S.C. §§ 20 U.S.C. § 1414(a)(2), 1414(b)(3)(B); Del. Admin. C. §§ 925.4.2; 925.4.3.6. The purpose of the evaluation is both to ensure continued eligibility for services and to guide the content of the child's IEP. 20 U.S.C. § 1414(c)(1)(B); Del. Admin. C. §§ 925.4.2; 925.4.3.6.

32. Assessments should be used and administered in accordance with producer protocols. 14 Del. Admin. C. §§ 925.4.3.1.3; 925.4.3.1.5. Evaluations must be conducted in the "mode of communication and…form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally." 14 Del. Admin. C. § 925.4.3.1.2. For students with sensory, manual, or speaking impairments, school districts must

ensure that the assessments are administered in such a way as to accurately reflect the child's abilities. 14 Del. Admin. C. § 925.4.3.3.

33. Moreover, data reviewed as part of the evaluation process should include historical information if relevant to the child's needs, "information about the child's physical condition, [and] social or cultural background." 14 Del. Admin. C. § 925.6.3. The information must be "documented and carefully considered." Id.

34. Delaware regulations impose additional requirements on evaluations when certain IDEA eligibility classifications are to be considered. For example, to find a student eligible for an Emotional Disability, the IEP team must consider, among other things, classroom observations by a teacher and at least one other member of the IEP team and child interviews. 14 Del. Admin. C. § 925.6.9. Similarly, to consider a student eligible for a Mild Intellectual Disability, the evaluation, among other things, must show an IQ of 50 to 70 points, plus or minus five points, and it must include written documentation "that the child's response to scientific, research based intervention was assessed in accordance with [14 Del. Admin. C. § 925.]12.0."

35. Because an evaluation must be sufficiently comprehensive to assess all areas of suspected need, parental disagreement with an evaluation for failing to assess certain areas of need is proper grounds to request an IEE. When "a parent disagrees with the evaluation because a child was not assessed in a particular area, the parent has the right to request an IEE to assess the child in that area to determine whether the child has a disability and the nature and extent of the special education and related services that child needs." OSERS [Office of Special Education and Rehabilitative Services] Letter to Baus (February 23, 2015) (available at https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/ acc-14-012562r-baus-iee.pdf).

36. An IEP must be based upon an appropriate and comprehensive evaluation which identifies the student's complete educational needs. East Penn School Dist. v. Scott B.,999 WL 178363 at *5 n.6 (E.D. Pa. Feb. 23, 1999) ("an IEP cannot be appropriate if the evaluation is incomplete") (internal quotations omitted), aff'd, 213 F.3d 628 (3d Cir. 2000) . A two-pronged analysis applies in reviewing a school's IEP development under the IDEA: (1) whether the school complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit consistent with a student's potential. Endrew F. v. Douglas County School District RE-1, 137 S. Ct. 988 (2017); Board of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982). See also Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004); Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999); Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 184 (3d Cir. 1988).

37. It is abundantly well-settled that "education" extends beyond "academics," and includes the social, emotional, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. M.C. v. Central Regional School Dist., 81 F.3d 389, 393-394 (3d Cir. 1995); Polk, 853 F.2d at 181-182; Kruelle v. New Castle Cnty. School Dist., 642 F.2d 687, 693 (3d Cir. 1981); Armstrong v. Kline, 476 F. Supp. 583 (E.D. Pa. 1979), modified and remanded sub nom., Battle v. Commonwealth, 629 F.2d 269 (3d Cir. 1980). Therefore, for an IEP to be appropriate, it must offer a child the opportunity to make progress which is "meaningful" in *all* relevant educational domains under IDEA, including behavioral, social and emotional. M.C., 81 F.3d at 394; Ridgewood, 172 F.3d at 247. 38.

39. The IDEA sets forth the right of a parent to obtain an IEE at public expense if the parent disagrees with the District's evaluation and the evaluation is determined inappropriate. 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502(b)(1). Accord 14 Del. Admin. C. § 926.2.0.

40. Courts have repeatedly upheld the entitlement of parents to an IEE where a school district performs an inappropriate evaluation or reevaluation. In fact, in 2005 the Supreme Court forcefully supported this entitlement, stating parents "have the right to an independent educational evaluation of their child [and IDEA's] regulations clarify this entitlement by providing that a parent has the right to an independent educational evaluation at public expense if the parent disagrees with the evaluation obtained by the public agency. IDEA thus ensures parents' access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion. They are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition." Schaffer v. Weast, 546 U.S. 49, 60-61 (2005).

41. The Court in Phillip C. v. Jefferson County Bd. of Educ., 701 F.3d 691 (11th Cir. 2012), emphasized the importance of IDEA's provisions authoring reimbursement for IEEs:

> ***The right to a publicly financed IEE guarantees meaningful participation throughout the development of the IEP....*** Without public financing of an IEE, a class of parents would be unable to afford an IEE and their children would not receive, as the IDEA intended, "a free and appropriate public education" as the result of a cooperative process that protects the rights of parents. There is "nothing in the statute to indicate that when Congress required States to provide adequate instruction to a child 'at no cost to parents,' it intended that only some parents would be able to enforce that mandate."

Id. at 698 (emphasis added, citations omitted). Thus, courts have emphasized that parents are entitled to an IEE not only to challenge a school district's evaluation in a due process

proceeding, but to have a ***sufficiently complete and comprehensive evaluation to be able to develop a meaningful IEP***.

42. 34 C.F.R. § 300.502 provides:

...

> (2) If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either—
>
> (i) File a due process complaint to request a hearing to show that its evaluation is appropriate; or
>
> (ii) Ensure that an independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing pursuant to §§ 300.507 through 300.513 that the evaluation obtained by the parent did not meet agency criteria.
>
> ...
>
> (4) If a parent requests an independent educational evaluation, the public agency may ask for the parent's reason why he or she objects to the public evaluation. However, the public agency may not require the parent to provide an explanation and may not unreasonably delay either providing the independent educational evaluation at public expense or filing a due process complaint to request a due process hearing to defend the public evaluation.

43. In L.C.'s case, the District's November 4, 2015 ESR clearly failed to meet the requirements of IDEA, as well as federal and Delaware regulations, and therefore is inappropriate. Among other defects, the ESR relied on instruments that were inappropriate given L.C.'s S/L and fine motor deficits; failed to include testing in key areas of educational need; did not adhere to proper protocols; and failed to include testing required by Delaware regulations for assessment of areas of eligibility of which L.C. was suspected to qualify.

44. The cognitive testing selected was inappropriate given L.C.'s needs. The cognitive assessment administered to L.C., the Wechsler Intelligence Scale for Children, 5th Edition, is one of the more verbally based cognitive assessments, yet L.C. has a significant S/L impairment. Given L.C.'s language impairments, it would have been appropriate to administer a

nonverbal test of intelligence; however, none was administered. In addition to her significant language impairments, LC.'s fine motor deficits may have impacted her performance on the assessment. For these and additional reasons, the results of the District's cognitive testing of L.C. were unreliable, and likely led to an improper eligibility classification.

45. The ESR also included results from the Behavior Assessment System for Children, 2nd Edition ("BASC-2"); however, these rating scales were completed by L.C.'s teacher on September 29, 2015. L.C. had started at DGS, at the earliest, on September 5, 2015, so her teacher had known her for barely three weeks at the time the BASC-2 was completed. However, the BASC-2 protocols require raters to have known the child for a minimum of six months. As such, the BASC-2 was not administered in accordance with the test producer's instructions in violation of 14 Del. Admin. C. § 925.4.3.1.5. For this and other reasons, the District's behavioral assessment of L.C. was flawed and inappropriate.

46. The ESR also omitted L.C.'s extensive medical history. Delaware regulations require an IEP team to consider a student's historical information and physical condition, social or cultural background, and adaptive behavior. 14 Del. Admin. C. § 925.6.3. Instead of heeding this requirement, the ESR included merely a short list of some of L.C.'s medical conditions. In fact, the evaluating psychologist was not even sure why L.C. was admitted to the therapeutic setting, betraying a lack of understanding of her significant, complex emotional/behavioral and trauma-related needs.

47. The purpose of triennial evaluations under the IDEA is both to confirm eligibility *and* to guide the content of the student's IEP. 14 Del. Admin. C. § 925.4.2. Yet, the District failed to conduct additional assessments of L.C., which the District at the hearing acknowledged would be helpful, for the invalid reason that the assessments would not have informed the team's

determination regarding L.C.'s eligibility. This erroneously narrow focus on eligibility overlooks that a triennial evaluation must also assess all areas necessary to guide the content of a student's IEP. 20 U.S.C. §§ 20 U.S.C. § 1414(c)(1)(B); Del. Admin. C. §§ 925.4.2; 925.4.3.6. The ESR in this case contained no direct assessment of memory; social skills; attention; ADHD-related behaviors; or trauma. By not comprehensively assessing L.C.'s specific needs, the District cannot develop an appropriate IEP targeted to L.C.'s needs, and cannot then determine whether she is making progress in those areas.

48. Even focusing solely on IDEA eligibility, as the District incorrectly did, the November 4, 2015 ESR failed to meet Delaware criteria for data required in assessing a student's eligibility for services under the IDEA – specifically eligibility as a student with a Mild Intellectual Disability and/or an Emotional Disability.

49. The November 4, 2015 ESR inappropriately contained no S/L or OT testing, which were required as L.C. had significant, documented deficits in those areas. The District erroneously maintained that it considered *medical* evaluations in those areas which were administered by A.I. duPont Hospital, and that those purely medical assessments were sufficient to meet the District's non-delegable obligation to evaluate L.C.'s educational needs as its student. These medical evaluations, which were over one year old at the time of the November 4, 2015 ESR, were for the purpose of making recommendations for medical treatment outside school, and did not contain necessary assessments or recommendations to make them appropriate to use as the basis for educational programming. Moreover, the A.I. duPont reports were not even *discussed* at the November 4, 2015 ESR meeting.

50. L.C. has numerous concerning behaviors in the school setting, yet the ESR failed to include a functional behavioral assessment ("FBA"), in order to determine the triggers for

L.C.'s problematic behaviors, and to identify positive reinforcements to address those behaviors. As of August 26, 2015, just weeks prior to the initiation of the ESR, L.C.'s psychiatrist noted her poor impulse control and aggression issues, causing her to be a "safety risk to herself and other children in the classroom." L.C. has made threats to others in school. L.C. receives treatment for inappropriate sexual behaviors, self-harm, and homicidal ideations. She pulls her hair out, intentionally draws blood and bruises herself, and "has frequently made statements about wanting to harm friends, family, and strangers in sexual and/or gruesome manners." When a student demonstrates interfering behaviors, such as those indicated in L.C.'s records, an evaluation should include an FBA to assess why those behaviors are occurring and to enable the team to plan for those behaviors. The District's failure to do so resulted in an ESR that omitted yet another crucial component of L.C.'s educational programming.

51. The District's ESR was further deficient in that, despite L.C.'s known severe mental health issues, her being seen by a psychiatrist, and the clear and documented effect of her mental health issues on her education, as well as her documented history of abuse and neglect, the District failed to perform any psychiatric assessment of L.C.

52. For these and other reasons set forth below, the Panel should have found the District's ESR to be inappropriate, and ordered the District to provide the Family with an IEE at public expense, consisting of: (1) a neuropsychological assessment; (2) a psychiatric assessment; (3) an OT assessment; (4) an FBA; and (5) a S/L assessment.

53. Despite its obligation to determine whether the District's ESR was inappropriate, 34 C.F.R. § 300.502(b)(2), the Panel incorrectly set forth no analysis of the appropriateness of the District's ESR. Instead, the Panel, with no analysis whatsoever, ordered that the District, through its own employees, merely "repeat" the "educational evaluations of neuropsychological

testing, speech/language testing, and occupational therapy testing[,]" despite the fact that the District had never performed such assessments in the first place. The only logical conclusion of the Panel's Order is that the District's ESR was inappropriate for failing to conduct appropriate, comprehensive assessments in these areas of need for L.C.

54. Nothing in IDEA allows a school district that has performed an inappropriate evaluation to be permitted to "repeat" its own inappropriate, or never-performed, assessments. Rather, the *only* remedy contemplated by IDEA is for the District to fund *independent* testing and assessments, *not* to give the school district that performed the inappropriate assessments a "second bite at the apple" by allowing the school district to perform them again or, in the case of assessments that were never performed, for the first time. 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502(b)(1). Accord 14 Del. Admin. C. § 926.2.0. Thus, the Panel's Order should be reversed on this basis, and the District should be ordered to fund independent assessments in these areas of need.

55. The Panel, by ordering that the District fund an independent psychiatric evaluation and an independent FBA, necessarily, and correctly, concluded that the ESR was deficient for failing to perform these assessments. However, there was absolutely no basis for the Panel to restrict the professionals who could perform these assessments to those contained on a "list" chosen by the very school district who failed to perform these assessments. Rather, the Parents should be allowed to choose any independent, licensed psychiatrist to perform the psychiatric evaluation without being restricted by the persons that the District decides to include on the "list." Similarly, the Parents should be permitted to have the FBA performed by any qualified evaluator without regard to any "list" of such analysts provided by the District.

56. Thus, the Panel's Order should be reversed to the extent that it does not allow the Parents to independently select qualified professionals to perform the ordered psychiatric assessment and FBA, rather than ones selected by the District and placed on a "list."

57. IDEA permits recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415(i)(3)(B); 34 C.F.R. § 300.517; Daniel S. v. Scranton School Dist., 230 F.3d 90, 95 (3d Cir. 2000).

58. Plaintiffs are the prevailing party in the Special Education proceedings, having obtained key relief sought in the Due Process hearing: a ruling that the District must fund an independent psychiatric assessment and an independent FBA. Furthermore, if Plaintiffs prevail in the present proceeding, they will thereby be entitled to an additional award of statutory attorneys' fees.

59. The IDEA requires an independent review of the administrative decision and permits a court to grant the relief sought by Plaintiffs, since the statute expressly endows courts with broad authority to grant "such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(A); 34 C.F.R. § 300.516(c)(3). The IDEA further provides that federal courts hearing such matters "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii).

WHEREFORE, the Plaintiffs respectfully request that this Court:

1. Assume jurisdiction over this action;

2. Hear additional evidence as appropriate pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii).

3. Find that the District's November 2015 ESR was inappropriate;

4. Reverse the decision of the Panel allowing the District to "repeat" neuropsychological, Speech/Language, and Occupational Therapy assessments, rather than

ordering the District to fund private assessments in these areas; and ordering the Family to choose a psychiatric and behavioral evaluators from "lists" provided by the District;

5. Order that the District fund independent neuropsychological, Speech/Language, Occupational Therapy, and psychiatric assessments, as well as an independent Functional Behavioral Assessment, with the evaluators to be chosen by the Family;

6. Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs;

7. Declare the Defendant's actions and omissions to be violative of IDEA and Delaware law; and

8. Grant such other relief as this Court deems proper.

Respectfully submitted,

Caitlin E. McAndrews, Esquire
DE Bar ID #: 6179

McANDREWS LAW OFFICES, P.C.
Foulk & Wilson Professional Centre
910 Foulk Road, Suite 200
Wilmington, DE 19803
(302) 380-4975 (phone)
(302) 302-348-3779 (fax)

Counsel for Plaintiffs